IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
DOCKET NO. 5:20-CR-106-KDB-DSC

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) **MEMORANDUM AND** |
| ANTHONY MAURICE TUCKER, | ) **RECOMMENDATION** |
| Defendant. | ) |

THIS MATTER is before the Court on "Defendant Anthony Tucker's Motion to Suppress," Doc. 15, filed April 20, 2021. The "Government's Response To Defendant's Motion to Suppress," Doc. 16, was filed April 27, 2021. The Court conducted an evidentiary hearing on May 13, 2021.

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1), and the Motion is now ripe for consideration.

Having fully considered the record and following an evidentiary hearing, the undersigned respectfully recommends that Defendant's Motion to Suppress be <u>denied</u> as discussed below.

## I. FACTUAL BACKGROUND AND FINDINGS

Defendant is charged in a one-count Bill of Indictment with possession of firearm by felon in violation of 18 U.S.C. § 922(g)(1). During the hearing, the Court heard testimony from Officer Aaron Travis of the Hickory Police Department and ATF Agent James Wingler. The Court also viewed the video captured by Officer Travis' body worn camera during the traffic stop and the

video of Defendant's interview by law enforcement on December 30, 2020.

On July 18, 2020, Officer Travis was patrolling on Highway 70 East in Hickory, North Carolina. The highway has multiple lanes in both directions and is divided by a median. Travis was approaching a part of the highway where there is a break in the median. Defendant was travelling in the left most lane of the westbound highway and executed a u-turn onto the eastbound lanes. There is no signage at that location prohibiting a left turn or u-turn. Travis had to swerve to avoid Defendant's vehicle as it turned across his lane of travel. He initiated a traffic stop and identified Defendant as the driver. He advised Defendant that he was being stopped for an illegal u-turn and a safe movement violation. Travis ultimately arrested Defendant on an outstanding warrant. He also observed a firearm in the side pocket of the driver's door and charged Defendant with possession of firearm by felon.

On December 16, 2020, Defendant was indicted for possession of firearm by felon by a Grand Jury in the Western District of North Carolina. He was arrested on the federal charge on December 30, 2020. Following his arrest, Defendant was interviewed by Agent Wingler, SBI Agent Shane Green, and Longview Police Investigator Josh Rector. The interview was videotaped. Agent Wingler advised Defendant of his Miranda rights at the outset and Defendant signed a waiver.

For approximately the next twelve minutes, Agent Wingler explained the federal charge and what Defendant could expect in court. Then Agent Green began to speak about an open investigation involving a homicide that occurred in 2008.

For approximately the next fifty minutes, Defendant spoke with the officers about the homicide investigation. Defendant was very talkative and animated throughout the interview. The officers informed Defendant that they believed that he was involved in the homicide. During this

portion of the interview, Defendant spoke with officers freely and never expressed a desire to speak with an attorney or to stop answering questions. After just over an hour into the interview, Agent Green asked Defendant if he would submit to a polygraph. Defendant replied that he would. They then discussed the reason for a polygraph and how it might rule out Defendant as a suspect. Green then asked Defendant if he would provide a DNA sample. Defendant replied "I'd rather not. I'd rather get a lawyer 'cause now we're talkin' about murder charges and I already said I would take a polygraph to exort[sic] myself." (Govt.'s Ex. 3, at 1:08:12-18). In response to Defendant's statement, officers told him that it was fine if he did not want to provide a DNA sample. They asked him if he felt pressured and he said no.

The officers then shifted focus to a different aspect of the homicide investigation. Defendant continued to speak freely for approximately another ten minutes before investigators begin to wrap up the interview. Defendant then engaged in a brief conversation with Agent Wingler about the federal charge. He admitted purchasing the firearm for protection after unknown individuals fired shots at his home and car. He paid $230-240 for the firearm. The total interview lasted nearly an hour and a half.

## II. ANALYSIS

Defendant moves to suppress all evidence seized from the vehicle on July 18, 2020 as well as statements made to law enforcement on December 30, 2020. He asserts that his Fourth Amendment rights were violated by an unlawful traffic stop that led to the search of his vehicle. He further alleges that his Fifth Amendment rights were violated when he made incriminating statements about the firearm after he had invoked his right to counsel.

### A. Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011), abrogated in part on other grounds by Rodriguez, 575 U.S. 348, 355-57 (2015), (citing Whren v. United States, 517 U.S. 806, 809–10 (1996)). "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." Wilson v. Arkansas, 514 U.S. 927, 931 (1995); see also Whren, 517 U.S. at 810 ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.").

The Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Kansas v. Glover, ––– U.S. ––––, 140 S. Ct. 1183, 206 L.Ed.2d 412 (2020) (quoting United States v. Cortez, 449 U.S. 411, 417–418 (1981); see also Terry v. Ohio, 392 U.S. 1, 21–22 (1968). When a law-enforcement officer has reasonable suspicion that a driver has violated traffic laws, the officer may stop the vehicle to investigate. Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation."). Whether reasonable suspicion justified a traffic stop is determined by the totality of the circumstances. United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011).

The Fourth Circuit recently stated:

> Reasonable suspicion to initiate a brief investigative traffic stop requires a particularized and objective basis for suspecting the particular person stopped of criminal activity. Although it is a commonsense, nontechnical standard, to support a finding of reasonable suspicion the detaining officer must either articulate why a

> particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance. In practice, this typically means that an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist.

United States v. Feliciana, 974 F.3d 519, 522–23 (4th Cir. 2020) (internal quotation marks, brackets, ellipsis, and citations omitted). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Glover, 140 S.Ct. at 1187 (2020) (quoting Prado Navarette v. California, 572 U.S. 393, 397 (2014)). And the Feliciana court also recognized that "[o]fficers often base their suspicion in part on their practical experience and specialized knowledge, which we credit when assessing the constitutionality of their actions." Id. at 525.

The first question before the Court is whether Officer Travis had reasonable, articulable suspicion to stop Defendant's vehicle on the evening of July 18, 2020. The Government argues that Defendant's u-turn and the fact that Officer Travis had to swerve to avoid Defendant's vehicle as it turned across his lane of travel are ample evidence of a violation of North Carolina traffic law and give rise to a reasonable, articulable suspicion to stop the vehicle. Defendant argues that the u-turn was legal and there is no evidence that he made an unsafe movement or impeded Officer Travis' ability to travel up Highway 70 and therefore there was no reasonable, articulable suspicion for the stop.

Based upon the evidence presented, the Court finds Officer Travis' testimony credible and concludes that Defendant's vehicle made an unsafe movement prior to the traffic stop. It is a traffic violation under N.C. Gen. Stat. Ann. § 20-154 to make an unsafe movement. Having observed Defendant's vehicle make an unsafe movement, Officer Travis had reasonable, articulable

suspicion to stop the vehicle. The stop of Defendant's vehicle was proper and did not violate the Fourth Amendment.

> B. **Statements Obtained During December 30, 2020 Interview**

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law…" U.S. Const. Amend. V.  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that an accused has the right under the Fifth Amendment to have an attorney present during custodial interrogation.  The accused must be informed of this right before law enforcement may initiate questioning. <u>Id.</u> at 467–68.  A defendant may waive his <u>Miranda</u> rights if he does so "knowingly and voluntarily."  <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979). When an accused knowingly and voluntarily waives his right to counsel after receiving the <u>Miranda</u> warnings, police are free to question him. <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994).

Pursuant to the Supreme Court's ruling in <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), law enforcement officers must immediately cease questioning when an accused invokes his right to counsel during custodial interrogation.  The purpose of the <u>Edwards</u> rule is to prevent police from badgering a defendant into waiving his previously asserted right to counsel. <u>Davis</u>, 512 U.S. at 458; <u>Michigan v. Harvey</u>, 494 U.S. 344, 350 (1990); <u>Oregon v. Bradshaw</u>, 462 U.S. 1039 (1983). If police subsequently initiate interrogation without counsel present and without a break in custody, the suspect's statements "are presumed involuntary and therefore inadmissible as substantive evidence at trial." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 177 (1991).

The Supreme Court refined the <u>Edwards</u> holding in <u>United States v. Davis</u>, 512 U.S. 452 (1994), providing guidance as to what constitutes a clear assertion of the right to counsel.  The

Supreme Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require cessation of questioning." Id. at 459 (emphasis in original). "Rather, the suspect must unambiguously request counsel." Id.; see also, Tice v. Johnson, 647 F.3d 87, 107 (4th Cir. 2011)(An invocation is unambiguous when a "reasonable police officer under the circumstances would have understood" the suspect intended to invoke his Fifth Amendment rights.).

In Davis, the Supreme Court held that the statement, "[m]aybe I should talk to a lawyer," was not an unambiguous request for counsel, and that officers were not required to stop questioning or ask clarifying questions. Id. "If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect." Id.

The Fourth Circuit has consistently held that vague statements alluding to or inquiring about counsel do not amount to an invocation of the right to counsel. See, e.g., United States v. Santiful, 701 F. App'x 242, 244 (4th Cir. 2017)(finding defendant's statement that "[g]otta a lawyer here right now?" was not a clear unequivocal invocation of his right to counsel); United States v. Williams, 446 F. App'x 587, 590 (4th Cir. 2011) ("I don't think I want to say anything more until I talk to a lawyer"); United States v. Smith, 281 F. App'x 198, 200 (4th Cir. 2008) ("I think I might need to talk to a lawyer."); Johnson v. Harkleroad, 104 F. App'x 858, 867 (4th Cir. 2004) ("[M]aybe I should stop talking and get a lawyer."); United States v. Wheeler, 84 F. App'x 304, 306 (4th Cir. 2003) ("[I want to] call [his] family to see about a lawyer."); Burket v. Angelone, 208 F.3d 172, 199 (4th Cir. 2000) ("I need somebody that I can talk to."); Mueller v. Angelone, 181 F.3d 557, 573 (4th Cir. 1999) ("Do you think I need an attorney here?").

It is undisputed that Defendant was in custody during the recorded interview on December 30, 2020. The recording clearly shows Agent Wingler reading Defendant a Miranda warning before the interview began. Defendant signed a waiver form acknowledging that he understood his rights. (Govt.'s Ex. 3, at 0:00:30–0:02:45).

Defendant argues that he unequivocally invoked his right to counsel when he replied to Agent Green, "I'd rather not. I'd rather get a lawyer 'cause now we're talkin' about murder charges and I already said I would take a polygraph to exort[sic] myself." (Govt.'s Ex. 3, at 1:08:12-18). But since Defendant mentioned an attorney in "the midst of a continuous flow of conversation," "an objective listener could not have known anything more than that [he] 'might' have wanted the assistance of counsel, which is an insufficient invocation of Fifth Amendment rights." United States, v. Williams, 446 F. App'x 587, 591 (4th Cir. 2011). The entire context of Defendant's statement wherein he mentioned an attorney was ambiguous, and thus "the officers ha[d] no obligation to stop questioning him." Davis, 512 U.S. at 462; see also, United States v. Sweeny, 887 F.3d 529, 536 (1st Cir. 2018) ("Nonetheless, [the defendant] continued to talk, unprompted, thus creating ambiguity as to whether he was invoking his right to counsel.").

The majority of the conversation between Defendant and the officers related to the 2008 homicide. The Court finds that the officers reasonably believed that his mention of an attorney was in relation to providing a DNA sample for the homicide investigation. If it was Defendant's intent to consult with counsel at that point in the interview, his invocation of that right was ambiguous. The Court concludes that on the record as a whole, Defendant did not clearly and unequivocally invoke his right to counsel during the interview and his Fifth Amendment rights were not violated by the officers continuing their questioning.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that "Defendant Anthony Tucker's Motion to Suppress," Doc. 15, be **DENIED**.

## IV. **NOTICE OF APPEAL RIGHTS**

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 147 (1985); Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Wells, 109 F.3d at 201; Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and to the Honorable Kenneth D. Bell.

**SO RECOMMENDED.**

Signed: June 4, 2021

David S. Cayer
United States Magistrate Judge